UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

CARRIE LYNN VELEY,

                    Plaintiff,

        -vs-                           **No. 1:13-CV-01204 (MAT)**
                                       **DECISION AND ORDER**
CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL SECURITY,
                    Defendant.

---

## I.   Introduction

        Represented by counsel, Carrie Lynn Veley ("plaintiff") brings this action pursuant to Title XVI of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her application for supplemental security income ("SSI"). The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g). Presently before the Court are the parties' cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons discussed below, plaintiff's motion is granted to the extent that this matter is remanded to the Commissioner for further administrative proceedings consistent with this Decision and Order.

## II.  Procedural History

        The record reveals that in August 2010, plaintiff (d/o/b May 21, 1978) applied for SSI, alleging disability as of October 15, 2009. After her application was denied, plaintiff requested a hearing, which was held before administrative law judge

David S. Lewandowski ("the ALJ") on March 29, 2012. The ALJ issued an unfavorable decision on July 20, 2012. The Appeals Council denied review of that decision and this timely action followed.

## III.  Summary of the Evidence

### A.    Physical Impairments

Treatment notes from Jones Memorial Hospital ("Jones Memorial") span the time period from October 2008 through September 2011, during which plaintiff treated for various physical complaints and attended intermittent physical therapy. The record reveals that plaintiff had a history of Chiari I malformation[1] and decompression surgery associated with that condition. In May 2009, she visited Jones Memorial ER complaining of neck pain, headache, nausea, and vomiting. She reported a history of similar symptoms, "but note[d] that they had been relieved after decompression surgery." T. 390. Plaintiff's physical examination was essentially normal, but a physician's assistant noted that she would be "managed for her trapezius muscle spasm." T. 391. Over the next few

---

[1]  Chiari malformation, also known as Arnold-Chiari malformation, is a condition affecting the brain. It consists of a downward displacement of the cerebellar tonsils through the foramen magnum (the opening at the base of the skull), sometimes causing non-communicating hydrocephalus as a result of obstruction of cerebrospinal fluid (CSF) outflow. The condition can cause headaches, fatigue, muscle weakness, difficulty swallowing (sometimes accompanied by gagging), choking and vomiting, dizziness, nausea, tinnitus, impaired coordination, neck pain, unsteady gait (problems with balance), poor hand coordination (fine motor skills), numbness and tingling of the hands and feet, and speech problems (such as hoarseness).

months, plaintiff treated approximately monthly, complaining of neck pain, blurred vision, and left foot pain.

Plaintiff appeared for an initial physical therapy examination in October 2009. She reported difficulty turning her head to the right, losing vision, left hand soreness, bilateral hand numbness, and neck pain. Plaintiff reported that she "did well" for approximately two years following her decompression surgery, but recently began experiencing symptoms including vision changes and "arm symptoms." T. 401. She reported that her pain upon examination was "2-3/10 however, it [did] get up to a 10/10." Id. Later that month, plaintiff treated at the University of Rochester Medical Center for follow-up related to her decompression surgery. Plaintiff described headaches lasting as long as three days associated with nausea and photophobia. Dr. Webster Pilcher noted that plaintiff "present[ed] with a different headache syndrome than she had prior to surgery," also noting that imagining postoperatively was stable. T. 663. Plaintiff attended 12 physical therapy treatment sessions from November 2009 through January 2010, and upon discharge was noted to have full cervical range of motion and strength, full upper extremity strength, and 0/10 pain.

A September 2009 MRI of the cervical spine indicated "some compression on the ventral aspect of the medulla oblongata by the dens," with "no abnormal signal changes in the brain stem or cord at [that] level"; and reversal of cervical curvature suggesting

some muscular spasm. A November 2009 MR Angiography of the brain showed an impression of "[s]tatus post wide occipital cranectomy, although tonsils still herniated below the level of the foramen magnum and there [was] much less compression than before"; and "some CSF flow anterior to the craniocervical junction," but "no flow posteriorly." T. 665.

From April through May 2010, plaintiff attended occupational therapy sessions for treatment of carpal tunnel syndrome. Upon discharge it was noted that plaintiff met her goals for treatment. From September through October 2010, plaintiff attended physical therapy sessions for treatment of low back pain with intermittent numbness and tingling into her bilateral lower extremities. Upon discharge, plaintiff "reported less pain, demonstrated improved active range of motion lumbar extension, demonstrate[d] improved strength throughout both hips and reported improved function." T. 450.

In November 2010, plaintiff reported for pain management therapy on referral from her treating physician, Dr. Andrew Call. Dr. Billy Carstens noted that a post-surgical MRI of the cervical spine "showed a wide occipital craniectomy with . . . signal changes at the C6 through T1 level consistent with a syrinx."[2] T. 452. Throughout the relevant time frame, plaintiff continued

---

[2] A syrinx is a rare, fluid-filled neuroglial cavity within the spinal cord (syringomyelia), in the brain stem (syringobulbia), or in the nerves of the elbow.

with pain management, reporting back and leg pain. She was prescribed pain medication and intermittently received nerve block injections for pain.

A July 2010 lumbar spine MRI showed degenerated T11-T12 and L2-L3 disc, degenerated and herniated L4-L5 discs, and degenerated L5-S1 disc without large bulge or herniation. In December 2010, on recommendation from Dr. Carstens, plaintiff once again began physical therapy. At that time, she complained of back and leg pain, demonstrated pain to palpation of her lower back and paraspinals, and had positive straight leg raise ("SLR") test at 70 degrees bilaterally. A December 2010 CT of her lumbar spine showed right lateral disc protrusion encroaching upon the neural foramen at L4-L5 and a small right paracentral disc bulge or protrusion at L5-S1.

In May 2011, Dr. Richard Welles, who treated plaintiff at the Neuroscience Center, noted that plaintiff's carpal tunnel syndrome appeared to be "minimally symptomatic." T. 353. Plaintiff received further occupational therapy treatment for her carpal tunnel syndrome, and was discharged in July 2011 reporting a maximum 5/10 pain rating.

An April 2011 MRI showed a syrinx extending from the lower portion of plaintiff's C6 vertebra to T1. The syrinx was noted to be stable since a prior September 2009 MRI. In August 2011, plaintiff's pain management specialist, Dr. Carstens, opined that

5

plaintiff's "present pain condition [was] causing a moderate disability in terms of her activities of daily living." T. 493.

The record also contains 168 pages of treatment notes from plaintiff's primary care physician, Dr. Call. These notes, which are largely illegible, span the time period from December 2006 through November 2011. It is apparent from the legible portions of the notes (evidently written by an assistant) that plaintiff sought treatment with Dr. Call for the various issues for which she treated at Jones Memorial. For example, legible portions of the notes (which portions constitute a small minority of the notes themselves) indicate that during at least the time period spanning September 2009 through December 2010, plaintiff appeared for treatment complaining variously of neck pain, dizziness, ear pain, headaches, vertigo, acute back pain, numbness in the legs, and "pain all the time." See T. 588, 592, 596, 600, 604. Dr. Call's notes, which are handwritten, are nearly impossible to decipher due to his handwriting and the quality of the copies received by the Administration.

In May 2010, Dr. George Sirotenko examined plaintiff at the request of the state agency. Plaintiff's physical examination was essentially normal. Dr. Sirotenko noted, however, that plaintiff appeared "mildly tearful." T. 208. Dr. Sirotenko opined that plaintiff had mild limitations for repetitive twisting, turning, grasping, pushing, pulling, or lifting objects on a repetitive

basis with the upper extremities. In October 2010, Dr. Samuel Balderman examined plaintiff at the request of the state agency. Physical examination was normal with the exception of a 50 percent of full squat. Dr. Balderman opined that plaintiff had mild physical limitations "related to her poor weight control only." T. 303.

**B.   Mental Impairments**

Plaintiff began treatment with ARA Specialists in Human Services ("ARA") in March 2010. At ARA, she primarily treated with Dr. Sampath Neerukonda and LMSW Caprice Murphy. Upon initial consultation, plaintiff reported depression and anxiety. She presented with a disheveled appearance, depressed mood and flat affect, slowed speech, mildly impaired judgment and insight, moderate anxiety, and withdrawn and passive personality characteristics. After initial examination at ARA, plaintiff was referred for treatment at New Horizons.

On March 30, 2010, MSE at New Horizons showed that plaintiff was moderately depressed with tearfulness, slight tremor of the hands, and poor eye contact. She reported fleeting suicidal ideation without intent, and stated that she did not enjoy her three children and felt hopeless that her situation would not improve. Plaintiff treated with New Horizons, in both individual and group therapy, on several occasions through June 2010. MSE conducted in association with an initial psychiatric evaluation

performed by Dr. Neerukonda indicated a depressed and anxious mood, but was otherwise normal. Dr. Neerukonda diagnosed bipolar disorder, mixed, and attention deficit disorder ("ADD"). He noted that he "[felt] that probably she definitely need[ed] Lithium" for treatment of bipolar symptoms. Upon plaintiff's discharge from New Horizons in June 2010, it was noted that she "appeared disinterested in treatment, as attendance and engagement quickly decreased." T. 249.

In July 2010, plaintiff returned to ARA and met with Dr. Neerukonda. Upon MSE, plaintiff was oriented to person and place, but not time. Her mood was depressed and affect was anxious. Dr. Neerukonda noted a continuing diagnosis of bipolar disorder, mixed, and prescribed Lamictal and Seroquil. Also in July 2010, plaintiff treated with LMSW Murphy, who noted that plaintiff was tearful and reported anxiety related to family stress, as well as medication management issues. On August 12, 2010, plaintiff was once again tearful and reported being "very depressed"; she also reported debilitating back pain. The next day, Dr. Neerukonda noted that plaintiff was somewhat depressed and anxious, and stated that her "[t]hought process [was] not the greatest in the world" at the session. T. 289. Dr. Neerukonda prescribed Lithium for treatment of bipolar disorder.

In September, plaintiff reported to Dr. Neerukonda that she had discontinued taking Lithium because it "made her feel very

anxious and very nervous." T. 288. Dr. Neerukonda encouraged her to take her prescribed medication. In October, Dr. Neerukonda noted that plaintiff "seem[ed] to be doing very well" and "functioning very good." T. 286. MSE was normal except for mildly depressed mood and anxious affect. Dr. Neerukonda continued plaintiff on Lithium.

In May 2010, Dr. Christine Ransom performed a psychiatric examination at the request of the state agency. On MSE, plaintiff's voice was "moderately dysphoric and moderately edgy"; affect was similar; plaintiff was oriented to time, place, and person; attention and concentration were mildly impaired "by mood disturbance and anxiety as well as limited intellectual capacity"; immediate and recent memory was moderately impaired but remote memory was intact; intellectual functioning appeared in the borderline range; and insight and judgment were good "as she cooperates with treatment as recommended." T. 213. Dr. Ransom opined that plaintiff could follow and understand simple directions, perform simple tasks independently, maintain attention and concentration for tasks, maintain a regular schedule, and learn simple tasks. According to Dr. Ransom, plaintiff was moderately limited in "performing complex tasks independently, relating adequately with others and appropriately dealing with stress due to bipolar disorder currently moderate, anxiety disorder NOS currently moderate and limited intellectual capacity most likely in the borderline range." T. 214.

In May 2010, Dr. Hillary Tzetzo completed a psychiatric review technique and mental residual functional capacity ("RFC"). Upon review of plaintiff's file, Dr. Tzetzo opined that plaintiff was mildly limited in activities of daily living ("ADLs"); moderately limited in maintaining social functioning and in maintaining concentration, persistence, or pace; and had no history of repeated episodes of decompensation. Dr. Tzetzo found that plaintiff "should be able to understand and follow work directions in a work setting (with low public contact), maintain attention for such work tasks, relate adequately to a work supervisor for such work tasks, and use judgment to make work related decisions in a work setting (with low public contact)." T. 227. Dr. Tzetzo's mental RFC found various moderate limitations in understanding and memory, sustained concentration and persistence, social interaction, and adaptation.

In July 2008, Dr. Robert Maiden performed a psychiatric examination at the request of the state agency. On MSE, plaintiff was "somewhat defensive, somewhat immature." T. 297. Dr. Maiden noted that she was "very slow-paced," speech was "fluent, although monotonous," "affect appeared to be apathetic," and she "seemed to be a little bit on the irritable side." T. 297. Otherwise, MSE was normal. He diagnosed dysthymic disorder. According to Dr. Maiden, plaintiff could understand and follow simple directions and perform simple tasks.

In December 2010, Dr. M. Totin completed a second psychiatric review technique, in which he found that plaintiff had no restrictions in activities of daily living; mild restrictions in social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. He opined that plaintiff "would be capable of at least simple work in a low stress, low contact setting." T. 322.

### C.   Evidence Submitted to Appeals Council

Subsequent to the ALJ's decision, plaintiff submitted four additional treatment notes from Dr. Neerukonda, spanning October 2011 through March 2012. In October 2011, plaintiff presented with depressed mood and anxious affect. Dr. Neerukonda noted that she "seem[ed] to be doing reasonably well," "except she still continue[d] to struggle with her bipolar illness where she is very weepy sometimes, increasingly depressed, down in the dumps, hopelessness, helplessness, worthlessness, isolated, withdrawn, does not have much motivation and getting frustrated." T. 758. She "continue[d] to take all her medications as prescribed, but still not feeling good." Id. Dr. Neerukonda began plaintiff on Geodon (a medication for treatment of schizophrenia and bipolar disorder) and continued her other psychiatric prescriptions.

In November 2011, plaintiff was oriented to person and place, but not time. She continued to demonstrate depressed mood and anxious affect. Dr. Neerukonda added Saphrix sublingual

11

(a schizophrenia medication) to her medication regimen. He noted that she "seem[ed] to be not doing that good" and had stopped taking her Geodon. T. 759. He stated that she was "still having a lot of issues and mood swings continue to be the problem." Id. In January 2012, plaintiff once again presented oriented to place and person, but not time, and demonstrated depressed mood and anxious affect. Dr. Neerukonda's notes were somewhat contradictory. While he noted that she appeared to be "functioning reasonably well" and her "[t]hought process [was] doing pretty good," he also noted that she was not oriented to time, and stated that there was "[n]o evidence of any big problems going on, except she is still feeling somewhat depressed and down in the dumps," but was "a little bit giggly" at the treatment session. T. 760. In March 2012, Dr. Neerukonda noted that plaintiff was mildly depressed and anxious. Plaintiff reported still having mood swings, "but [reported that] most of the time she [was] doing very well." T. 761. Plaintiff's medications were Celexa (an antidepressant), Pristiq (an antidepressant), Lithium (for bipolar disorder), and Lamictal (for bipolar disorder).

## IV. The ALJ's Decision

The ALJ followed the well-established five-step sequential evaluation promulgated by the Commissioner for adjudicating disability claims. See 20 C.F.R. § 404.1520. At step one, the ALJ determined that plaintiff had not engaged in substantial gainful

12

activity since August 5, 2010, the application date. At step two, the ALJ found that plaintiff suffered from the following severe impairments: status post neck surgery, degenerative disc disease of the lumbar spine, bilateral carpal tunnel syndrome, bilateral knee pain, bipolar disorder, anxiety disorder, and obesity. At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. In considering the paragraph B criteria, see 20 C.F.R. § 404 Subpart P, App. 1 § 12.00, the ALJ found that plaintiff had no restrictions in ADLs, mild difficulties in social functioning, and moderate difficulties with concentration, persistence, or pace.

Before proceeding to step four, the ALJ determined that plaintiff retained the RFC to perform light work as defined in 20 C.F.R. §416.967(b) except that she: could only occasionally climb stairs, balance, and stoop; could never kneel, crouch, crawl, or climb ladders, ropes, or scaffolds; could never reach overhead but occasionally up to shoulder level; could occasionally flex, extend, and rotate her neck; could frequently finger but not write for more than five minutes at a time; must have a sit/stand option; could perform simple instructions and tasks; and could work in small familiar groups with occasional interactions with others. After finding that plaintiff had no past relevant work, the ALJ found that considering plaintiff's age, education, work experience, and RFC, there were jobs existing in significant numbers in the

national economy which plaintiff could perform. Accordingly, he found that she was not disabled.

## V.    Discussion

A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by "substantial evidence" or if the decision is based on legal error. 42 U.S.C. § 405(g); see also Green-Younger v. Barnhard, 335 F.3d 99, 105-06 (2d Cir. 2003). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

### A.    Failure to Develop the Record

Plaintiff contends that the ALJ failed to develop the record, especially considering that she was unrepresented at the hearing level. At the hearing, the ALJ asked plaintiff whether she had any additional documentation to submit, but plaintiff indicated that she did not. The ALJ closed the record at the conclusion of the hearing. Plaintiff argues that the ALJ failed in his "heightened" duty to develop the record where plaintiff was proceeding *pro se*. See Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990). Specifically, plaintiff contends that the ALJ should have sought out functional assessments from plaintiff's treating sources.

After a thorough review of this record and careful consideration of the applicable case law, the Court concludes that

the ALJ failed to appropriately develop the record in this case. Initially, the Court notes that this is not a case where the record is "scant." see <u>Cruz</u>, 912 F.2d at 11. Rather, the record in this case is quite dense. It consists of detailed treatment notes, over a period of several years, regarding plaintiff's physical and mental impairments. However, for the reasons discussed below, this record did not offer a complete picture of plaintiff's functional limitations.

As the Commissioner points out, it is not always appropriate to remand simply because the ALJ failed to obtain a functional assessment from a treating physician. This is particularly true where the record is otherwise complete and contains opinions from consulting medical sources. See, e.g., <u>Tankisi v. Comm'r of Soc. Sec.</u>, 521 F. App'x 29, 34 (2d Cir. 2013) (noting that the text of 20 C.F.R. §§ 404.1513(b)(6) and 416.913(b)(6) "indicates that '[m]edical reports *should* include . . . [a] statement about what you can still do despite your impairment,' not that they *must* include such statements") (emphasis in original); <u>Pellam v. Astrue</u>, 508 F. App'x 87, 89-90 (2d Cir. 2013) (holding that ALJ had no duty to contact treating source for statement, even where ALJ had *no* opinions from treating sources, where ALJ's RFC finding was consistent consulting examiner's findings).

However, the holdings of <u>Tankisi</u> and <u>Pellam</u> were fact-specific. In <u>Tankisi</u>, the Court noted that the record was extensive

15

and that it did contain an assessment of limitations from one of the plaintiff's treating physicians. In explicitly limiting the holding, the Second Circuit stated: "Given the specific facts of this case, including a voluminous medical record assembled by the claimant's counsel that was adequate to permit an informed finding by the ALJ, we hold that it would be inappropriate to remand solely on the ground that the ALJ failed to request medical opinions in assessing residual functional capacity." 521 F. App'x at 34.

In Pellam, the Court held that the ALJ had no further duty to obtain a functional assessment from a treating physician, where the ALJ based his RFC finding on a consulting examination, and the RFC finding was consistent with medical evidence from plaintiff's treatment history. The Court specifically stated that under those circumstances, "especially considering that the ALJ also had all of the treatment notes from Pellam's treating physicians," the ALJ did not commit reversible error.

This case, however, presents significant distinctions from those controlling Second Circuit cases. First, unlike in Tankisi and Pellam, the plaintiff in this case was unrepresented at the hearing level. Thus, she did not have the benefit of counsel to assemble a record for the ALJ's review. The Court finds this especially significant considering plaintiff's diagnosis of bipolar disorder. See, e.g., Corporan v. Comm'r of Soc. Sec., 2015 WL 321832, *2-3 (S.D.N.Y. Jan. 23, 2015) ("The law in this circuit and

elsewhere points to the commonsense conclusion that, where a claimant is both unrepresented by counsel and obviously handicapped by a mental impairment, an ALJ bears a doubly heighted [*sic*] duty to develop the record. . . . That a claimant's mental illness may, in the same way, impede her from presenting her own case and necessitate greater assistance from the ALJ is evident.").

In this nonadversarial proceeding, and under these circumstances which included vagueness in the record as discussed below as well as a claimant with a mental impairment, it was incumbent upon the ALJ to advise plaintiff of the importance of obtaining functional assessments from her treating physicians. See, e.g., Soto v. Comm'r of Soc. Sec., 2010 WL 4365528, *9 (E.D.N.Y. Oct. 1, 2010) (noting that considering deficiencies in the record in combination with ALJ's failure to "explain to [the claimant] the importance of obtaining an opinion from her treating physician or mental health provider," remand was warranted) (citing Cruz v. Sullivan, 912 F.2d 8, 12 (2d Cir. 1990)), report and recommendation adopted, 2010 WL 4340540 (E.D.N.Y. Oct. 27, 2010).

Second, although the record contained voluminous treatment notes from Dr. Call, they were largely illegible. There is no evidence in the record that the ALJ attempted to clarify Dr. Call's notes. It is clear from the legible portions of Dr. Call's notes, however, that over a five-year time frame he regularly treated plaintiff for impairments related to her application. Thus, unlike

17

in <u>Pellam</u>, on this record the ALJ was unable to determine whether Dr. Call's clinical findings were consistent with the consulting examinations or with the ALJ's RFC finding. See, e.g., <u>Jackson v. Barnhart</u>, 2008 WL 1848624, *8 (W.D.N.Y. Apr. 23, 2008) (remanding the ALJ's decision in light of the ALJ's failure to develop the record due to illegible treatment notes).

Third, regarding plaintiff's mental health impairments, the ALJ's findings were based on his conclusion that "the medical evidence suggest[ed] that her conditions [were] improving and/or resolving[.]" T. 33. The ALJ focused on Dr. Neerukonda's statements that plaintiff was "coming along very well" and doing "pretty good." T. 33. However, the ALJ ignored notations from Dr. Neerukonda indicating that, at least intermittently, plaintiff was not oriented to time; plaintiff did not display good thought processes; and plaintiff was noncompliant with psychotropic medications. The ALJ's selective assessment of plaintiff's psychiatric treatment does not convince the Court that he fully reviewed and considered her mental health treatment. See, e.g., <u>Nix v. Astrue</u>, 2009 WL 3429616, *6 (W.D.N.Y. Oct. 22, 2009) (noting that an ALJ may not engage in a "selective analysis of the record" and "may not ignore an entire line of evidence that is contrary to [his] findings") (internal quotation marks omitted).

Moreover, as plaintiff emphasizes, Dr. Neerukonda's treatment notes submitted to the Appeals Council after the ALJ's decision

indicated that plaintiff demonstrated abnormal mental status on at least two occasions in which she was oriented to person and place, but not to time. The ALJ did not have the benefit of these notes, which contradict his conclusion that plaintiff's condition was "improving and/or resolving." T. 33. Based on the Court's reading of Dr. Neerukonda's treatment notes, it is apparent that plaintiff had a serious mental health impairment requiring multiple medications for treatment of bipolar disorder and schizophrenia. Considering that fact, combined with the somewhat contradictory nature of Dr. Neerukonda's comments in his notes, it was especially necessary for the ALJ to obtain a functional assessment from a treating source as to plaintiff's actual mental limitations in a work setting.

For all of these reasons, the Court concludes that under the particular circumstances of this case, it was error for the ALJ to fail to seek treating source opinions from plaintiff's treating physicians and mental health providers.

**B.    Weight Given to Medical Source Opinions**

Plaintiff contends that the ALJ committed reversible error in failing to state what weight, if any, he gave to the consulting source opinions. The Court agrees. The ALJ summarized the relevant consulting opinions; however, he did not state the weight given to the opinions. Rather, the ALJ stated, "[a]s for the opinion evidence, it is noted that no treating or examining physician has

indicated that the claimant is totally disabled or has limitations greater than those given in the above residual functional capacity." T. 33.

Where there is no treating source opinion before the ALJ, the ALJ is required to state the weight given to consulting opinions before him. See Duell v. Astrue, 2010 WL 87298, *5 (N.D.N.Y. Jan. 5, 2010) ("The regulations further require an ALJ to 'explain in the decision the weight given to the opinions of a State agency medical or psychological consultant,' unless the ALJ has given controlling weight to the opinions of a treating source."). Here, the ALJ did not state the weight given to any opinions. This error was especially harmful considering that the ALJ summarized six separate consulting opinions, regarding plaintiff's physical and mental limitations, and the record actually contained additional consulting opinions from earlier time frames. It is entirely unclear from the ALJ's decision what opinions, if any, he relied upon to reach his RFC finding. This is especially troublesome, of course, because it leads to the possibility that the ALJ did not give weight to any of the opinions, but simply substituted his own medical judgment and interpreted the raw medical data in coming to his RFC determination. Although the RFC determination is an issue reserved for the Commissioner, "an ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's

assessment is not supported by substantial evidence." Dailey v. Astrue, 2010 WL 4703599, *11 (W.D.N.Y. Oct. 26, 2010) (quoting Deskin v. Comm'r of Soc. Sec., 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008)).

## VI. Instructions on Remand

Consistent with the above, on remand, the ALJ is directed to obtain specific and detailed functional assessments from plaintiff's treating sources, including Drs. Call and Neerukonda. The ALJ is also directed to clarify with Dr. Call, to whatever extent necessary, the contents of his treatment notes in order to have a full understanding of the record as a whole as well as an understanding of any assessment ultimately provided by Dr. Call.

The Court is particularly cognizant of the significant mental health issues indicated by this medical record. Although the evidence in this case indicates quite serious mental health impairments, the Court lacks a statement from a treating physician regarding whether those impairments meet a listing or whether functional limitations stemming from the impairments render plaintiff unable to work. In the absence of a medical source statement, the Court is unable to determine that "the record persuasively demonstrates the claimant's disability," see Gibbs v. Colvin, 2015 WL 9217081, *5 (W.D.N.Y. Dec. 17, 2015) (citing Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980)); therefore, the Court must remand for further proceedings.

In connection with her diagnosis of bipolar disorder, plaintiff was prescribed various psychotropic medications (including Lithium, Geodon, Lamictal, and Pristiq) for treatment of that disorder. Additionally, Dr. Neerukonda prescribed Saphrix, sublingual, which is traditionally prescribed to treat symptoms of schizophrenia. Geodon, another of plaintiff's medications, is also often prescribed to treat symptoms of schizophrenia. These prescriptions, in themselves, are indicative of the seriousness and complexity of plaintiff's mental health condition.

Although Dr. Neerukonda often noted that plaintiff was "doing well" on certain occasions during treatment, his decision to prescribe these psychotropic medications indicates that he regarded plaintiff's condition as quite serious. Indeed, the treatment notes reflect that he modified these medications on a continuing basis in order to provide plaintiff with appropriate treatment. Plaintiff's demonstrated noncompliance with prescription medication treatment, under these circumstances, is a further indicator that her mental health impairments interfered with her functioning. See, e.g., Reals v. Astrue, 2010 WL 654337, *2 (W.D. Ark. Feb. 19, 2010) ("According to the DSM, patients suffering from . . . bipolar disorder also suffer from . . . poor insight . . . predispos[ing] the individual to noncompliance with treatment[.]").

The record does not indicate that plaintiff has been diagnosed with schizophrenia in addition to bipolar disorder. However, in

22

light of the evidence that plaintiff was treated with psychotropic medication designed to treat the symptoms of both bipolar disorder and schizophrenia, on remand, the ALJ is directed to obtain a specific opinion from Dr. Neerukonda as to whether plaintiff suffers from either of these conditions to the degree described in a listing. See 20 C.F.R., Pt. 404, Subpt. P, App. 1 §§ 12.03, 12.04. The ALJ must also obtain from Dr. Neerukonda a detailed statement as to the functional limitations plaintiff experiences as a result of her mental health impairments.

On remand, the ALJ is further directed to weigh the medical source opinions in accordance with the appropriate legal standards. After the ALJ fully develops the record and obtains statements from treating sources, it may no longer be necessary for the ALJ to explicitly state what weight, if any, he elects to assign to consulting opinions. See Norward v. Colvin, 2015 WL 6509452, *5 (W.D.N.Y. Oct. 28, 2015) (noting that where ALJ gave controlling weight to treating source's opinion, he was not required to state weight given to consulting opinion). Regardless, the ALJ must clearly state his reasoning for arriving at his RFC determination and must assign weight to the opinions as directed by the regulations. See 20 C.F.R. § 416.927.

## VII. Conclusion

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Doc. 11) is denied and plaintiff's

motion (Doc. 8) is granted to the extent that this matter is remanded to the Commissioner for further administrative proceedings consistent with this Decision and Order.  The Clerk of the Court is directed to close this case.

**ALL OF THE ABOVE IS SO ORDERED.**


**S/Michael A. Telesca**
HON. MICHAEL A. TELESCA
United States District Judge

Dated:     January 29, 2016
           Rochester, New York.